# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Donald Krimm and Audrey Krimm,   :
his wife,   : No. 2235 C.D. 2015
  : Argued: April 11, 2016
               Appellants   :
  :
            v.   :
  :
Municipal Authority of   :
Westmoreland County   :


BEFORE:   HONORABLE PATRICIA A. McCULLOUGH, Judge
             HONORABLE MICHAEL H. WOJCIK, Judge
             HONORABLE ROCHELLE S. FRIEDMAN, Senior Judge


OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE WOJCIK[1]                FILED: December 30, 2016


Donald Krimm and Audrey Krimm (Appellants) appeal from the October 23, 2015 order of the Court of Common Pleas of Westmoreland County (trial court), which granted the motion for summary judgment filed by the Municipal Authority of Westmoreland County (Authority) and dismissed Appellants' complaint, concluding that Appellants failed to allege facts that fell within an exception to governmental immunity. We affirm.

The underlying facts are as follows. On January 24, 2011, an unidentified motorist struck an Authority-owned fire hydrant. Authority

---

[1] This matter was reassigned to the author on October 11, 2016.

employees undertook repairs, and, while they were shutting down the fire hydrant, a water main that serviced Appellants' home ruptured, resulting in water damage to Appellants' driveway, garage, and home.

On May 8, 2013, Appellants filed a complaint alleging that the water main ruptured due to the failure of Authority employees to adhere to known standards, including manufacturer's instructions, during their repair of the fire hydrant. Appellants also alleged that "the prospect of a ruptured municipal water main" caused by improper maintenance constituted a dangerous condition of the Authority's water system facilities, which existed for a sufficient period of time prior to Appellants' injuries for the Authority to have taken preventive measures. Complaint, ¶¶8, 9, 11, 12.

The Authority filed an answer and new matter asserting, *inter alia*, that Appellants' claim does not fall within the utility service facilities exception to governmental immunity.[2]  Following discovery, the Authority filed a motion for

---

[2] Local government agencies are generally immune from liability for damages caused by the negligent acts of the agency or its employees. Sections 8541-8542 of the Judicial Code, 42 Pa.C.S. §§8541-8542.  However, Section 8542(a) of the Judicial Code waives governmental immunity where a party demonstrates that: (1) the damages would be recoverable under common law or a statute creating a cause of action if the injury were caused by a person not having available the defense of governmental immunity; (2) the injury was caused by a negligent act of the local agency or its employee acting within the scope of his office or duties; and (3) the negligent act falls within one of the enumerated exceptions to governmental immunity.  42 Pa.C.S. §8542(a); *McCarthy v. City of Bethlehem*, 962 A.2d 1276, 1278 (Pa. Cmwlth. 2008).

The utility service facilities exception, set forth in Section 8542(b)(5) of the Judicial Code, states that a local agency may be held liable for:

> A dangerous condition of the facilities of steam, sewer, water, gas or electric systems owned by the local agency and located within rights- of-way, except that the claimant to recover must establish that the dangerous condition created a reasonably foreseeable risk

**(Footnote continued on next page…)**

summary judgment, asserting that it was immune from liability because the utility service facilities exception to governmental immunity does not apply. The trial court determined that Appellants' allegations, the relevant pleadings, and the evidence presented did not establish that a dangerous condition of a facility or system owned by the Authority existed or that the Authority had actual notice or could reasonably be charged with notice if such a condition did exist. Relying on *Metropolitan Edison Company v. Reading Area Water Authority*, 937 A.2d 1173 (Pa. Cmwlth. 2007), and *Le-Nature's Inc. v. Latrobe Municipal Authority*, 913 A.2d 988 (Pa. Cmwlth. 2006), the trial court concluded that Appellants' claim did not fall within the utility service facilities exception to governmental immunity and granted the Authority's motion for summary judgment.

On appeal to this Court,[3] Appellants argue that the trial court erred in granting summary judgment because the damages incurred as the result of preventable negligent conduct of Authority employees acting within the scope of

---

**(continued…)**

> of the kind of injury which was incurred and that the local agency had actual notice or could reasonably be charged with notice under the circumstances of the dangerous condition at a sufficient time prior to the event to have taken measures to protect against the dangerous condition.

42 Pa.C.S. §8542(b)(5).

[3] Our review of the trial court's order granting summary judgment is limited to determining whether the trial court committed an error of law or abused its discretion. *Greenleaf v. Southeastern Pennsylvania Transportation Authority*, 698 A.2d 170, 172 (Pa. Cmwlth. 1997). Summary judgment is appropriate only when, after viewing the record in the light most favorable to the nonmoving party, the court concludes that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. *Id.*

3

their employment. More specifically, Appellants assert that the testimony of Authority employees Ryan Kelvington, Gerald Sachs, Thomas Combetti, and Thomas Freeman, establishes that Authority employees were aware of manufacturer's instructions (a "White Paper") to shut down a hydrant slowly in order to prevent a pressure surge in the water line.[4] Appellants maintain that the employees' awareness of the need to use certain procedures when repairing the hydrant is sufficient to charge the Authority with knowledge that a dangerous condition would likely result from its employees' actions.

The Authority responds that, as noted in *Metropolitan Edison* and *Le Nature's*, the relevant inquiry under the utility service facilities exception is whether the allegedly negligent condition derived from or had as its source the local agency's facilities. According to the Authority, Appellants' allegations that the water surge was caused by the negligent acts of agency employees, specifically, the employees' failure to follow a recommended policy or procedure, do not allege facts falling within the exception. We agree.

In *Metropolitan Edison,* employees of a municipal water authority struck and damaged a utility line owned by Metropolitan Edison Company (Met-Ed) during the course of an excavation. Met-Ed filed a suit against the water authority, alleging that the water authority failed to take reasonable steps to protect Met-Ed's property. The water authority moved for summary judgment, asserting

---

[4] Appellants also cite a written statement by Michael Todd Harcum, a "utility man/pipe line inspector" with seventeen years of experience working in the distribution department of a local water company. Reproduced Record at 30a. Harcum opined that the proper procedure for shutting down a fire hydrant involves closing the hydrant slowly to avoid a spike in water pressure.

that it was immune from liability. The trial court granted the water authority's motion, and Met-Ed appealed to this Court.

On appeal, Met-Ed argued that the design, construction, installation, and maintenance of the water authority's water line, in close proximity to Met-Ed's utility line, constituted a dangerous condition of the water authority's water distribution system. In other words, Met-Ed contended that, by placing the water line in the same corridor as Met-Ed's utility line, it was reasonably foreseeable that the authority would strike Met-Ed's utility line while excavating.

We first noted that, under Section 8542(b)(5) of the Judicial Code, the allegedly dangerous condition must have derived or originated from, or had as its source the local agency's facilities. We then concluded that Met-Ed failed to allege that the dangerous condition originated with the water line. "Rather, Met-Ed alleged that [the authority] breached its duty under the [One Call Act[5]] because it failed to exercise due care and take reasonable steps to avoid damaging Met-Ed's property while excavating with a boring machine. Clearly, the dangerous condition, as alleged, originated with the conduct of the [water authority's employees]." *Id.* at 1175. Consequently, we held that the water authority was immune from liability.

In *Le-Nature's,* the appellant corporation was involved in a construction project. The appellant's general contractor contacted the One Call System[6] to determine whether there were any utility lines located where the

---

[5] The Act of December 10, 1974, P.L. 852, *as amended*, 73 P.S. §§176-186, is commonly known as the One Call Act.

[6] The One Call System is the communication system established within the Commonwealth to provide a single toll-free telephone number for excavators or other persons to **(Footnote continued on next page…)**

5

subcontractor intended to drill. No response was received from the Latrobe Municipal Authority or the City of Latrobe (together, Latrobe). The subcontractor proceeded with drilling and struck and damaged a sewer line owned and/or operated by Latrobe, causing significant delays in the construction project. The appellant brought an action against Latrobe for negligence and breach of implied contract, alleging, *inter alia*, that the defendants were required under the One Call Act to determine whether any utility or other lines or facilities were located in the area of the project prior to any excavation and to respond to a request made pursuant to the One Call Act. This Court held that the allegations, if proved, would establish a negligence claim, but not a claim that fell within the utility service facilities exception to governmental immunity. We explained that the dangerous condition was allegedly caused by Latrobe's failure to comply with the One Call Act and the subcontractor's digging and damaging the sewer line, but "[t]here was no allegation describing a dangerous condition of the sewer system itself . . . ." *Id.* at 994.

The facts alleged here are nearly identical to the facts alleged in *Metropolitan Edison*. As in that case, Appellants allege that "the negligent actions of [Authority employees] during their attempt to repair a fire hydrant*"* caused a water main to rupture and damage their property. (Appellants' brief at 4, Statement of the Question Involved). Although Appellants attempt to characterize the Authority employees' negligent conduct as a dangerous condition,[7] we

---

**(continued…)**

call public utilities or other facility owners and notify them of their intent to perform excavation, demolition or similar work. Section 1 of the One Call Act, 73 P.S. §176.

[7] As the language of Section 8542(b) of the Judicial Code, 42 Pa.C.S. §8542(b) illustrates, the General Assembly distinguished a *state of being* from *acts* when it waived **(Footnote continued on next page…)**

conclude that the facts alleged by Appellants fall squarely within our holdings in *Metropolitan Edison* and *Le Nature's*. As in those cases, Appellants do not allege a dangerous condition of the Authority's facilities but, rather, negligent conduct by Authority employees.

Additionally, even if a dangerous condition of the Authority's water system had existed as alleged, that is, while Authority employees were repairing the fire hydrant, Appellants' evidence, including the existence of the White Paper, is not sufficient to raise a genuine issue of material fact as to whether the Authority had actual or constructive notice of the alleged dangerous condition as required by Section 8542(b)(5) of the Judicial Code. Appellants argue that Authority employees knew that the fire hydrant must be closed slowly in order to avoid a pressure surge, and, therefore, the Authority had notice of the dangerous condition that resulted from its employees' negligence. We reject Appellants' effort to equate *foreseeability* with statutorily required notice "of the dangerous condition at a sufficient time prior to the event to have taken measures to protect against [it]." 42 Pa.C.S. §8542(b)(5). Simply put, Appellants' assertions that the Authority was aware of the potential risk of negligent conduct do not allege knowledge that a dangerous condition existed.

**(continued…)**

governmental immunity in discrete and limited circumstances, i.e., where injury results either from *an existing state* ("a dangerous condition" of trees, traffic controls and street lighting; utilities service facilities; streets; and sidewalks), 42 Pa.C.S. §8542(b)(4), (5), (6), (7), or from *conduct* ("operation of any motor vehicle" and the "care, custody or control" of personal property; real property, and animals), 42 Pa. C.S. §8542(b)(1). (2), (3), (8). The distinction is important because notice is a statutory prerequisite to every exception involving a "dangerous condition," but not to the other exceptions to governmental immunity.

7

Based on the foregoing, we conclude that the trial court properly relied on our decisions in *Metropolitan Edison* and *Le Nature's* to grant summary judgment to the Authority. Accordingly, we affirm.

_____
MICHAEL H. WOJCIK, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Donald Krimm and Audrey Krimm, his wife, : No. 2235 C.D. 2015
:
:
Appellants :
:
v. :
:
Municipal Authority of :
Westmoreland County :

O R D E R

AND NOW, this 30th day of December, 2016, the order of the Court of Common Pleas of Westmoreland County, dated October 23, 2015, is affirmed.

_____
MICHAEL H. WOJCIK, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Donald Krimm and Audrey Krimm,      :
his wife,                            :
                Appellants        :
                              :  No.  2235 C.D. 2015
              v.             :
                              :  Argued:  April 11, 2016
Municipal Authority of          :
Westmoreland County           :


BEFORE:    HONORABLE PATRICIA A. McCULLOUGH, Judge
                HONORABLE MICHAEL H. WOJCIK, Judge
                HONORABLE ROCHELLE S. FRIEDMAN, Senior Judge


## *OPINION NOT REPORTED*

DISSENTING OPINION BY
JUDGE McCULLOUGH                        FILED:  December 30, 2016


         Donald and Audrey Krimm (Appellants) have alleged that the damages they sustained "were the direct and proximate result of the negligence, carelessness and recklessness of [the Municipal Authority of Westmoreland County (Authority)] . . . in *creating or* allowing an unsafe, dangerous and hazardous condition to exist originating and deriving from its water main . . . ."  (Complaint at ¶13) (emphasis added).  These  allegations and the evidence of record raise a genuine issue of material fact sufficient to defeat the Authority's motion for summary judgment alleging that it is entitled to immunity pursuant to section 8542(b)(5) of the Judicial Code, commonly referred to as the Political Subdivision Tort Claims Act.[1]

---

[1] 42 Pa.C.S. §8542(b)(5).

Notably absent from the Majority's citation to Appellants' complaint is Paragraph 13, which specifically alleges the above. In omitting this allegation, the Majority determines that the present matter falls squarely within this Court's decision in *Metropolitan Edison Company v. Reading Area Water Authority*, 937 A.2d 1173 (Pa. Cmwlth. 2007), because Appellants alleged only negligence by the Authority's employees, not a dangerous condition of the Authority's facilities sufficient to satisfy the requirement of *Le-Nature's, Inc. v. Latrobe Municipal Authority*, 913 A.2d 988, 994 (Pa. Cmwlth. 2006), that the dangerous condition derive from, originate, or have its source in the local agency's realty. By framing the dangerous condition alleged as improper maintenance, rather than a dangerous condition created by the Authority and deriving from the Authority's water main, the Majority omits significant components of Appellants' complaint and neglects the governing standard when reviewing a grant of summary judgment.

Importantly, in *Metropolitan Edison*, it was impossible for the plaintiff to satisfy *Le-Nature's* requirement that the alleged dangerous condition originate or derive from the municipality's property because the only property that was implicated was **plaintiff-owned property**; no municipal-owned property was involved whatsoever. Rather, the allegation in *Metropolitan Edison* was that "the evidence of record indicates that the design, construction, installation and maintenance of Reading's water line, in close proximity to Met-Ed's utility line, constitutes a dangerous condition of Reading's water distribution system." 937 A.2d at 1175. In other words, the dangerous condition alleged in *Metropolitan Edison* was that it was reasonably foreseeable that the municipality would strike the plaintiff's water line because of its nearness to the municipality's water line.

Conversely, here, Appellants not only alleged that the dangerous condition, i.e., pressure surge, had its origin in municipal-owned property, but that the foreseeable dangerous condition in that property was created by the Authority. Unlike the plaintiff in *Metropolitan Edison*, Appellants' allegations are sufficient to bring Appellants' complaint within the purview of *Le-Nature's* and defeat the Authority's motion for summary judgment because Appellants alleged a dangerous condition originating in the Authority's property. Therefore, *Metropolitan Edison* is clearly distinguishable from this case.

Under the Majority's rationale, a municipal employee can create an alleged reasonably foreseeable dangerous condition in municipal-owned property and be immune from the damages caused thereby. I disagree. This Court's decision in *DeTurk v. South Lebanon Township*, 542 A.2d 213 (Pa. Cmwlth. 1988), is instructive.

In *DeTurk*, the township and the township authority (the township) hired a contractor to aid in construction of a waste-water collection system in an area adjacent to the plaintiff's property. During construction, the contractor added a layer of asphalt to a nearby road, which raised the road by approximately four inches. After completion of the project, a rainstorm caused extensive water to run off the road's surface and into the plaintiff's garage. The plaintiff attempted to remove plywood sheets from his garage, slipped, and fell. The plaintiff filed a complaint against the township alleging that his injuries were caused by the negligent construction of the water system. The township filed a motion for summary judgment asserting that the plaintiff's claim was barred by immunity.

The common pleas court granted the township's motion for summary judgment, reasoning that the plaintiff's allegations may fall within an exception to immunity; nevertheless, it determined that there was no evidence indicating that the

township had notice of the dangerous condition. On appeal to this Court, we reversed the common pleas court. We agreed that "the construction of the swale by the [t]ownship and the [a]uthority places them in the exception from immunity under Section 8542(b)(5)." *Id*. at 215. However, we determined that the record contained sufficient evidence to raise a genuine issue of material fact regarding whether the township had notice of the alleged dangerous condition because, among other things, the construction of the water system was in response to a known water drainage problem and "as parties responsible for the construction of the swale [the township] would, or at least should, have been aware of the damage caused by the work." *Id*. at 215-16.

Here, the record contains evidence that the Authority not only negligently repaired the damaged water hydrant but that its actions created the dangerous condition within the water main; actions which testimony indicated had previously caused a similar dangerous condition by the same authority. This Court has stated, and *DeTurk* makes clear, that a municipality may be subject to liability if the plaintiff proves that damages resulted from negligence in the construction *or maintenance of the water system*. *See also McCarthy v. City of Bethlehem*, 962 A.2d 1276, 1279-80 (Pa. Cmwlth. 2008); *Yulis v. Borough of Ebensburg*, 128 A.2d 118, 120 (Pa. Super. 1956). Here, Appellants alleged that the Authority's negligent repair created a dangerous condition of its water system, thereby rendering their complaint sufficient to defeat the Authority's motion for summary judgment. The Majority's holding that Appellants' allegation that the Authority's employees' negligence in creating the dangerous condition of its property renders the complaint legally insufficient to state a cause of action is inconsistent with *DeTurk* because an employee's creation of a dangerous condition is not dispositive.

The Majority maintains that, even if Appellants alleged sufficient facts to fall within an exception to immunity, their action is barred because the Authority did not have sufficient notice of the dangerous condition. But this assertion is belied by the record, which raises issues of fact regarding whether the Authority already had notice of the dangerous condition it would create in its property by its negligent acts. The Majority states that "Appellants' assertions that the Authority was aware of the potential risk of negligent conduct do not allege knowledge that a dangerous condition existed." (Majority op. at 7.)

Ryan Kelvington, the Authority's Risk Manager, testified as follows:

Q: Who did you obtain that exactly or precisely, from whom did you get that White Paper?

A: I got that from Mark Yackovich, who's our hydrant department supervisor.

\* \* \*

Q: Did you know the existence of this document, [the White Paper], before you spoke with Mr. Yackovich?

A: No.

Q: How did you learn that it was even in existence?

A: I believe *I asked him probably in working through these interrogatories if we had any type of hydrant policies and procedures and he responded that they follow Mueller's recommendation, which is when he provided me with [the White Paper].*

Q: Now, the answer to the interrogatory says a number of things and one of the things to paraphrase, it says that the Municipal Authority does not have a standard operating procedure, that they use on-the-job training and experience,

but they are providing this paper and do not believe it's controlling.

I just want to make sure I'm talking to the right witness. Is this an opinion that you hold or *is this some information you acquired from someone else,* if you have answered this question, again I'm sorry for repeating it, but I want to make sure I get every piece of information I can, this is the only time I get to talk to you?

A: I would, like I said, I would assume that comes from somebody else, that's not my knowledge of our hydrant department.

Q: Do you know who it was that gave you that information?

A: That gave me this document?

Q: No, not the document, the information that's in the interrogatory answer?

A: As I said, that's *mostly Attorney Vigilante and I answering your questions with information that we had in speaking with Mark Yackovich, who's our hydrant department supervisor, basically him telling me that they follow Mueller's recommendations.*

Q: When a hydrant is hit as a hydrant was in this case, do you know is there a standard operating procedure that you're aware of that the company follows?

A: I'm not aware of that.

(Notes of Testimony (N.T.), 5/11/2015, at 30-33) (emphasis added).

Similarly, Gerald Sachs, an Authority employee, testified:

A. And our problem is it's sort of like the thing if I look for it in the Mueller repair kit, you sort of learn things over the years, not by reading about it or learned it or anything, but you sort of *learn from the guy that did the job before you then, you know, is how I learned*. But that's what this is, that would be this, I'm sure they'll talk about it on there.

This is a nice picture we can use. There's the main valve is down there, the seat ring, coupling, barrel, yeah. Probably talks about how you do this I would assume then. Yeah, *I'm sure we do something very similar to it.*

(N.T., 5/11/2015, at 26-27) (emphasis added).

Sachs further testified:

Q: I'm not sure I understand, *why do you have to shut the hydrant down slowly?*

A: And that's through -- I think when you go down, I forget the term, there's an engineering term for it, you just have to go slow because if you do, it's possible that it *causes problems*, you know what I mean.

Q: What kind of problems?

A: I assume leaks then because like I said, the one on Pennsylvania Avenue I was with Jerry Lincoln at the time and I thought he was going down, I said slow down, Jerry, and he was closing the hydrant and it caused *a leak*.

Q: Where did it cause a leak at?

A: *On the main*.

Q: I was looking through *[the White Paper], it just says close the hydrant making the last few turns slowly to release the possibility of water hammer* and replace the nozzle cap back off so they are not too tight, is that indeed the --

A: Yeah, that's probably why they do it. I think that's a word that the bosses and the engineers use, water hammer.

(N.T., 5/11/2015, at 34-35) (emphasis added).

Sachs explained that it is rare for a hydrant repair to cause a water main break, but noted that *he has seen it occur when a former co-worker shut down a hydrant too quickly.* (N.T., 5/11/2015, at 31-32.)

Thomas Combetti, a thirty-six year Authority employee who performs hydrant repair, testified as follows:

Q: Is there a policy, a written policy that the Municipal Authority has that you follow when you're inspecting or testing a hydrant?

A: Pretty much, yeah.

Q: What is it?

A: Now, this is normal routine inspection. We take the caps off, make sure that --

MR. VIGILANTE: I think he said is it written, is it written down?

A: No, not really. We kind of just when one person had the job and the next, we just kind of -- *you learn from the person before you and the person that --*

BY MR. MICALE:
Q: I didn't want to step on your answer there, are you done?

A: Yeah, go ahead.

Q: One of the papers I got in this case was this *[White Paper], I wondered if you have ever saw this*?

A: I have seen that, *yeah.*

Q: Saw it at the Municipal Authority?

A: I think we have these, but we pretty much know what --

Q: *Are there any other written policy documents other than this one that I have shown you that has been marked as Exhibit C that you are aware of exists at the Municipal Authority?*

A: *No, this is it*.

(N.T., 5/11/2015, at 12-13) (emphasis added).

Thomas Freeman, an Authority employee on the hydrant crew, testified:

Q: That's what I'm getting at, why do you want to open it slowly and close it slowly?

A: Well, if you open it too fast, you're going to have that burst of pressure.

Q: What *if you close it too fast*?

A: *You'll have the water lock, water hammer*.

(N.T., 5/11/2015, at 18) (emphasis added).

Contrary to the Majority's position, the record contains evidence that the Authority possessed a White Paper that warned against shutting down a hydrant too quickly because of the resulting pressure surge; the White Paper was adopted as the Authority's policy; and an Authority employee previously shut down a hydrant too quickly, creating a pressure surge and subsequent water main rupture. *See Fenton v. City of Philadelphia*, 561 A.2d 1334, 1336 (Pa. Cmwlth. 1989) (concluding that failure to direct judgment in the city's favor was erroneous because the city had no notice of alleged dangerous condition where, *inter alia*, "the plaintiff offered no testimony *of any specific prior accidents*, let alone any accidents similar to the one involved here.") (emphasis added).

Kelvington testified that he learned of the existence of the White Paper when Yackovich, the Authority's hydrant department supervisor, provided it when

asked whether the Authority had any type of documents representing hydrant policies and procedures. Kelvington further testified that Yackovich advised him that "[the Authority] follow[s] Mueller's recommendation, which is when he provided me with [the White Paper]." (N.T., 5/11/2015, at 31.) Sachs testified that he was required to shut down hydrants slowly because the failure to do so could cause problems; specifically, he stated that the failure to shut down the hydrant slowly could cause a leak in the main and noted that a water hammer is a term he believed the "bosses and engineers use[.]" (N.T., 5/11/2015, at 35.) Sachs explained that it is rare for a hydrant repair to cause a water main break, but noted that he had seen it happen before when a former co-worker shut down a hydrant too quickly. Similarly, Combetti testified that he learned how to perform hydrant inspections from the individual who had the position before him, but clarified that he had seen the White Paper before and believed he had observed it at the Authority. He also stated that the White Paper is the only written policy document he is aware of that exists at the Authority. Freeman also testified that shutting down a hydrant too fast will create a water hammer.

Additionally, as in *DeTurk*, the record contains evidence that the Authority was responding to a known water system problem, i.e., a damaged hydrant, and its prior negligent acts created the same dangerous condition. *See also Penn v. Isaly Dairy Company*, 198 A.2d 322, 324 (Pa. 1964) ("In actions such as this, where plaintiffs seek to recover damages for personal injuries caused by negligence in creating and maintaining a dangerous condition, they are not required to prove the exact manner in which the condition developed; *nor is it necessary to prove notice where the condition has been created by defendant's own antecedent active conduct.*") (emphasis added); *Miller v. Lykens Borough Authority*, 712 A.2d 800, 802

(Pa. Cmwlth. 1988) (stating that, when an agency creates an obvious dangerous condition, negligence and notice are intertwined); *Poskin v. Pennsylvania Railroad Company*, 110 A.2d 865, 866 (Pa. Super. 1955) ("There are cases in which the attending facts in themselves may charge a defendant with constructive notice of a defect in a pavement 'where the condition was a likely and foreseeable result of the manner in which the premises were being maintained and used.'"). This evidence raises a genuine issue of material fact regarding whether the Authority could reasonably be charged with notice under the circumstances of the dangerous condition at a sufficient time prior to the event to have taken measures to protect against the dangerous condition, thereby precluding entry of summary judgment at this stage.

Where the record contains conflicting evidence and reasonable minds could differ regarding the conclusion, summary judgment is improper. *See Department of Transportation v. Patton*, 686 A.2d 1302, 1305 (Pa. 1997); *Ack v. Carroll Township Authority*, 661 A.2d 514, 519 (Pa. Cmwlth. 1995). Here, however, the Majority fails to adhere to standards governing review of a grant of summary judgment by not resolving doubts in favor of Appellants and determining instead that their allegations are insufficient to establish statutory notice, a fact-finding function that this Court is not authorized to perform.

The upshot of the Majority's holding is to ignore the existence of issues of fact raised by Appellants' allegations that the Authority's employees' negligent repair of a hydrant *created a dangerous condition of the water system*, even where the record contains evidence that the Authority's adopted policy warned against shutting a hydrant down too quickly because of the prospect of a water main rupture and the

precise incident complained of has occurred before in the same township and was known by the current Authority employees.

For the reasons stated above, I would reverse the order of the trial court granting the Authority's motion for summary judgment and remand for further proceedings.

_____
PATRICIA A. McCULLOUGH, Judge